Mr. Langs is here for Holmes, and Ms. Krigsman is here for the United States. Mr. Langs, you may begin when you're ready. Good morning. May it please the Court. This case is about the Fourth Amendment, and I think the most difficult question to answer is where even to begin. This, if I can be a little colloquial, it was a very fun case to engage in, at least from a lawyer's perspective. Academically, there is lots to work here. I hope it's my intent that I deftly leave two points of contention with this Court. First, I think the record was exemplarily developed in this matter. There was a number of briefings. There was the evidentiary hearing. There was, effectively, the supplemental appointing of my office, the Federal Defender's Office, as well as the U.S. Attorney's Office. I think the District Court did a wonderful job in canvassing the jurisprudence here, and there really is not much . . . Just looking at our standard of review, it's a mixed question. The findings of fact are reviewed for clear error in the conclusions of Logdanovo. Why don't we start with any findings of fact that are clearly erroneous? To be consistent and to try to succinctly answer Your Honor's question, the one material fact that seems to be the contention here is whether the gate was partially open or ajar. What evidence did you admit to place that material fact at issue? We didn't. In terms of Mr. Holmes, there wasn't evidence to submit, affirmative evidence. I should qualify that to show otherwise. We have counsel's argument that this issue is in contention, but an unrefuted factual record to support the District Court's determination that the gate was open. Is that the state of the record? I'm going to use the word unrebutted. There were three witnesses who testified. The one detective, Detective Tompkins in this case, is the only individual who, to the best of his memory, his recollection says that he recalls the gate on December 29, back in 2014, was not all the way open. It was not all the way closed. When given the question, was the gate partially ajar, his answer was, yes, sir. The District Court made a factual determination based on the testimony of those three witnesses that the gate was open. How can we, on review, declare that to be clearly erroneous and overturned? I'll clarify. One witness. The other two witnesses could not support that. You have to look at Detective Tompkins. At page 60, at the transcript, that's the particular area where he is able to give a degree in terms of the fact, which lends itself to the contention here in terms of what we find fault with what the District Court did in this case, is we take the position that the District Court said or made a finding that this one material fact was fatal in terms of trying to formulate a bright line rule to balance the interest of law enforcement and the homeowners to say, because the gate was ajar, that, in effect, makes Mr. Holmes lose this particular case. The Fourth Amendment is . . . I'm just trying to establish whether or not there was an erroneous finding of fact that the gate was ajar or open. I hear argument, but I just don't see a basis for us to declare clear error as to that factual finding. And I agree, Your Honor. I'm walking that fine line, and I'm just simply trying to be consistent with what the record has. There, Detective Tompkins testified the gate was partially open. We did not affirmatively introduce any evidence in terms of the evidence you're hearing to overcome that. Ideally, in a textbook world, could I say meaningfully that this Court has that factual finding to the review? Yes. I would love to have the analysis to further elucidate or investigate that particular fact. But the specific answer to that question is no. We don't have anything there. My legal objection, just as a matter of consistency, is to say our contention was the gate was closed on that day, but we don't have evidence to support that. Detective Tompkins is the one person who says, I remember it being open. Where does the curtilage begin? Does it begin with the gate or with the screened-in porch? With the gate. Okay. Which, segue, I'm sorry. Yes, Your Honor. As I understand the record, the first time that the confidential informant approached the residence, the gate was closed. Is that what the record says? Yes. Should we attribute any significance to the fact that when law enforcement first approached this residence, there was a different situation in terms of the gate? I would, because when we look to Fourth Amendment jurisprudence, the Supreme Court says that the analysis is reasonableness. We have to look to the totality of circumstances. And I think in finding fault, if I can, with what the district court tried to do, was formulate this bright-line rule in which it says, well, if there is a fence with a gate and a no-trespassing sign and the gate is closed, we win. I think this is a difficult situation because we're supposed to look at how a member of the public would view this residence, whether it's okay to come in or not. But in the case of law enforcement, they might make multiple attempts as they did in this case. And in applying the reasonable person standard, can we ignore the fact that law enforcement encountered a different situation when they first approached? Because, of course, law enforcement, unlike a Girl Scout or somebody approaching the door, might make multiple attempts. And on some of those attempts, might find the gate unlocked or open. Which goes to the reasonableness of Fourth Amendment jurisprudence. In any particular situation, I think that's our contention, Your Honor, to try to get to the heart of your question, is what the district court here did as a de facto matter was formulate a bright-line rule, applied that rule against what should have been applied, i.e., a totality of circumstance analysis, which should mean that, yes, we look to, I would suggest, the overall investigation of what law enforcement did. Meaning, in this case, chronologically, we have a complaint. Drugs are being sold out of this house. We have a first attempt with a C.I. in which the gate is closed. We have a second attempt in which the testimony, as far as I can read from the transcript, the C.I. broached the gate. We don't have any testimony as to whether the gate was open or closed on the second attempt, but that person went to the front door and was rebuffed again. We have a third approach by law enforcement in which, again, we don't have testimony as to whether the gate was open or closed on the first knock and talk, we'll say. And then, ultimately, we get to the fourth attempt to approach the home this December 29th date in which Detective Tompkins says, well, I recall the gate being slightly ajar, if you will. That goes to the totality of circumstances in terms of approaching whether or not a reasonable, respectful citizen has an invitation or an implied invitation to approach the front door. Our position is, when we look at all the surrounding circumstances in this residence, this home, in terms of what were presented specifically as to the knock and talk in this case, any implied license, any implied invitation to come to that front door, it wasn't there. I understand what your position is, but what's your best authority to support that we should look at those multiple attempts in informing our totality of the circumstances? I would suggest Hardines and then Jones and then the cases that flow from that. I think the Tennessee case, the Christensen case, does a wonderful job in trying to apply this analysis. I think now Justice Gorsuch in his dissent in the Carlis case out of the Tenth where we go to in terms of following what is required in terms of this totality of circumstance case. Our contention is that what the district court did here is when it looked to the various factors, it essentially said, well, I'm going to effectively exclude this particular factor from my analysis. I'm going to include this one particular material fact that's significant to my analysis, but I'm going to give de minimis weight to everything else that comes to play in this instance. And so our position is that if when we apply a totality analysis properly, at the end of the day, Mr. Holmes should win this case. So your argument is that the combination of a closed gate and the signs would lead to the conclusion that a reasonable person should not enter? As factors specific to this particular case, yes. In terms of what the court has on the record before it, in light of all the surrounding circumstances in this instance, the police simply did not have any implied license or any implied invitation to approach the front door. What about the fact that the front door was visible through the screened-in porch and no locks blocked entry? A factor to consider. Here you have a residential home in an urban setting with a chain link gate surrounding the property, effectively sealing it off with an enclosed and menched porch that hindered viewing to the front door that was closed, that's covered by burglar bars. Absent a door knocker, absent a doorbell, where can we say that there's an express invitation or even for that matter an implied invitation to approach the front door? Is there any evidence in the record from the evidentiary hearing that your client ordered any of the confidential informants off the porch because they were trespassing? I see my time is up, Your Honor. If it's okay, I can answer that question for you. In terms of any evidence, no, not one way or the other. There wasn't any evidence to show or establish what happened between the C.I.'s and Mr. Foer, in fact the person who answered the door, other than the testimony of what Detective Tompkins said that the C.I. or I should say Detective Anderson claims that the C.I. told them, i.e. about selling or buying drugs. That he declined to sell them anything? Yes. Okay. Thank you, Your Honor. Thank you, Mr. Lyons. We'll hear from Ms. Krigsman. Good morning, Your Honor. Cherie Krigsman for the United States. May it please the Court. When Detectives Tompkins and Yorton walked through an open gate in broad daylight and took the direct path to Michael Holmes' front door, they did so because the habits of the country, a societal convention deems it perfectly acceptable to approach a home, knock on the door, speak with the occupants, and absent an invitation to stay longer, to leave. And nothing that Michael Holmes did expressly told the detectives that they were categorically excluded from approaching his front door. What more does he have to do to, you know, revoke the implied license? He's got a chain-linked fence around the property. He's got four signs, no trespassing, the wear of dog, private property, multiple no trespassing, burglar bars, screened-in porch, dog in the front yard, garage boarded up, no doorbell. What more does he have, what would he have to do in order to expressly revoke an implied license to knock? Yes, Your Honor. And if I could address that in a couple of different steps. First of all, if we start, and of course in this circuit, our precedent, our guiding precedent is Taylor. And Taylor tells us that a fence with a closed gate is not enough to revoke the implied license. So if we start with that premise, and then we look to what the district court did below in considering all these other factors that Your Honor has mentioned, for instance, the dog and the burglar bars and the variety of signs, that none of these combined unambiguously to revoke the implied license. And in particular, with respect to the signs, Your Honor, because I think the district court, after considering a number of these factors, sort of honed down his analysis and looked at the three factors that he considered were the most important, the fence enclosing the property, the gate, and then the signs. I think you're giving a little more weight to United States versus Taylor than maybe we should, because if my understanding of Taylor is correct, we didn't analyze whether the homeowner revoked the implied license by entering a gate. We just upheld the constitutionality of a knock and talk investigation. Isn't that correct? That is correct. But in reaching that holding, Your Honor, the court referred to and relied on the Ninth Circuit decision in United States Davis that said, absent express orders to the contrary, the police may approach a front door and knock on that door to speak with the occupants. And in that case, the fence and the gate did not constitute those express orders. So Holmes has to, when there's a knock, hereby expressly revoke your implied license to knock and talk at my door? I'm sorry, Your Honor, I didn't hear the first part. Is that what Holmes has to do? I mean, what more would he have to do in order to expressly revoke the implied license? What else would he have to do? Well, yes, Your Honor, as we briefed and as the district court referred to in his order, there are two obvious ways that have been recognized in various cases that have dealt with this issue. The one is when he was amassing all this construction material on the side of his yard and buying the four other signs that he posted on the fence in front of the side yard, he could have purchased a $5 padlock and put that on the gate leading to the main gate leading to the front of the house. That would have been an express revocation of the implied license. Police officers cannot jump over a locked fence. We accept that as a violation of Fourth Amendment under, and particularly in the Middle District of Florida, there's the Cantana case on that point. He also could have expressly told visitors not to approach, but... He can do that with several no-trespassing signs? And Your Honor, there we... Property? Correct. Yes, Your Honor. He can't because no-trespassing signs do not mean that... No-trespassing signs do not mean that individuals cannot approach the front door to knock on the front door. No-trespassing signs are directed at trespassers. Trespassing is understood to be unauthorized or unlicensed use of the property for one's own purposes. When we have this implied license that it's been, that Justice Scalia said is formed as a result of the habits of the country, we need express orders to revoke that implied license and a no-trespassing sign goes to trespassers, not individuals who are going to come up to the door and knock for legitimate purposes. Counsel, what if the sign said, keep out? Would that be sufficient? Just a sign, no gate that says keep out. Yes, Your Honor. That's a much closer case for sure. And the question does arise if whether a sign in and of itself can revoke the implied license. I don't think that any court has resolved that affirmatively one way or the other, but that keep out is clearly a more express command or order than no-trespassing. Keep out would be a more, would apply to a range of visitors. It wouldn't apply to simply trespassers. And it might. I don't know. But in this case, this court need not decide that because, of course, there wasn't a keep out sign and there weren't any signs even, any signs instructing visitors to stay away that were posted on the main path to the front door. So we have layer, we have in this case, instead of having express orders revoking this default setting, the implied license, we have layer of ambiguity, ambiguity upon layer of ambiguity. We have ambiguous signs posted in an ambiguous manner, and we have an open gate. And I think I'd like to correct the record. I think I may have heard appellant's counsel say that the gate had been closed for both of the CI visits. And the record establishes, in fact, that in the December 3rd visit, and that's Dock 37 at 16 and 17, that the main gate had been open. And there was also, the magistrate judge made a finding in her R&R that based on the testimony from the detectives, that the CIs and the officers had not been told to leave the property. And there is some testimony in the record at Docks 37, 17, and 58, and then pages 100 and 128, indicating that when the officers debriefed the CI, they talked to the CI about what had happened. And it was the officer's understanding, Detective Tompkins' understanding, that the conversation had been brief and that Mr. Holmes had become about drugs, not because he had told them to leave the property. Let me ask you the question that I asked Mr. Langs. What is the significance, if any, legally to these prior attempts by law enforcement to reach the door? Yes, Your Honor, that goes to the ambiguity that the officers faced on December 29th when they made their successful knock and talk. Because they had been present on these other They had seen the gate open. And then on December 29th, they see the gate open again. This clearly indicates to them, as reasonable police officers, that Michael Holmes is not making efforts to keep people categorically excluded from the approach to his front door. So this, again, adds to the ambiguity that a reasonable person would have perceived if they had visited Michael Holmes' house. So if the gate was closed, but there was no padlock, would that support the express revocation or not? Your Honor, not in a residential setting and not with a chain link fence. So he needed a padlock on the gate in order to expressly revoke? That's one way he could have revoked it. There may be instances where a court determines that a different combination of signage or different message on signage would revoke. But here we don't have that. On the facts of this case, he needed to affix that gate in a closed setting and not allow people to come through it. Because a chain link fence in a residential setting just doesn't tell people categorically, you can't come up to my porch and leave a package. You can't come and return my dog who's escaped out of the open gate. I guess the question is whether or not the chain link fence in conjunction with everything else, the no trespassing signs, beware of dog. There's a bunch of other stuff here that you have to factor in. The garage boarded up, no doorbell, burglar bars. When you look at all these things, we have to look at a totality of the circumstances. And I think the problem with that, Your Honor, is that the totality of these circumstances, they don't unambiguously and clearly and categorically bar visitors because the gate is open and these signs are clustered on the right side of the house. There's not a single sign posted on the front, on the long stretch of lawn directly in front of the house. And the facts, the record shows that there was this construction project going on on the side of the house with piles of lumber. So a reasonable person coming to this property would not have interpreted the beware of dog sign, which was the only sign on the main gate to the entry, as prohibiting them from walking to the front door and knocking on the front door for the many reasons that people knock on a front door. They would have reasonably concluded that if those signs meant anything, the no trespassing signs, it meant that they couldn't trespass onto that side yard for their own purposes. So, is your position here that notwithstanding all the factors that Judge Wilson just articulated, we should not declare as a matter of law that implied consent was revoked on this record? That you should not. Let me ask, that was a poorly phrased question. Are you saying that we should not declare as a matter of law on this record that Holmes had revoked the implied consent to enter the property? Yes, Your Honor. Okay. And our position, the United States position, is that, to go more to this sort of the nub of the issue here, is that the no trespassing signs just don't get you there. And we know the open gate is an invitation to enter, and a no trespassing sign does not mean that individuals cannot approach the front door. You've argued that the no trespassing sign is ambiguous, that the sign should have been in front of the door, that maybe the sign should have been on the path to the house instead of on the fence. How does this provide any rule that law enforcement and people who want to bar folks from coming to their door can follow? Yes, Your Honor. I understand your question. And this is a constant struggle in these Fourth Amendment cases, and I was, in preparation for the argument, I was reading a number of them, and clearly the courts want to devise a categorical rule whenever they can to help police officers and the citizenry. But it also became apparent to me when I was reading these cases that the struggle, particularly in the Fourth Amendment context, is because you have this concept of reasonableness, and you have all the different circumstances that arise, the infinite range of circumstances that arise when a police officer is potentially involved in a Fourth Amendment situation, that it's very, very hard to come up with a categorical rule that is not overbroad and overgeneralizes. So in most cases, at least upon my review, most cases the courts defer to the totality of the circumstances test. And I think, in fact, last term, the Supreme Court, in the Collins v. Virginia case, rejected Virginia's attempt to fashion a categorical rule about approaching, about entering garages based on the automobile exception, and the court specifically said there, no, we're not going to fashion a categorical rule in this case. So it's certainly desirable to have a categorical rule when one can be formed, but as the district court judge said here, in these cases, little itty-bitty facts make a difference, and they make a difference to those police officers who are on the street and making quick judgments. And certainly, and also in the context, it's important to note, this is a knock and talk. This is a consensual encounter. So the invasion of privacy is very limited here. It's a limited, acceptable intrusion that has developed, that this implied license has developed from the habits of the country. So because it's a consensual encounter in the first instance, the concern, it's, we look at it in a slightly different light than we look at it in terms of executing a search warrant in a home or arresting an individual in the home. Did that answer your question? I hope it did. Any other questions, Your Honor? I see no further questions. Thank you, Ms. Grigsman. Thank you. Mr. Lang, you've reserved some time for rebuttal. Thank you, Your Honor. I hope, briefly and quickly, a couple of notes. I want to try to distinguish, i.e., the Taylor case from this court. The facts of that case I think are distinguishable from this particular instance. There you had 9-1-1 calls. You had essentially three hang-ups. In that particular opinion, I think the language was we would expect the police to have been derelict in its duty if it hadn't at least investigated the 9-1-1 call in that case, which lends itself So if we took that hypothetical, if police were responding to a 9-1-1 hang-up call at this address and the gate was closed, would the officers be permitted to enter the property? If the case rose to exigent circumstances, certainly. If you are investigating, in terms of the hypothetical, something serious inside, someone's being attacked, a child is being abused, there's something going on that needs officers' immediate circumstances, that allows for an exigent circumstance. But the Supreme Court has said that the police may enter property under the knock-and-talk doctrine to investigate evidence of criminal activity. Knock-and-talks, I agree. Knock-and-talks in and of themselves do not generally rise to the level of a search that implicates Fourth Amendment issues, but knock-and-talks obviously have to follow Fourth Amendment jurisprudence in a sense. To answer Judge Wilson's earlier question, all Mr. Holmes had to say as soon as he realized the police were at the door was, get off my porch, I don't want to talk to you. That's a retroactive answer in terms of our position, because by the time the police were at his front door, they had already committed a trespass, they had already violated the Fourth Amendment, and at that point, in terms of their act... If he wanted to make clear that he was revoking any authority to enter the property, that would be the answer to Judge Wilson's question, would it not? Get off my porch. I think as a practical matter, sure. If, for that matter in this case, if I might grab my copy of my transcript... Sure. ...I would submit that we have a problem there, because in this particular case, Detective Tompkins said... I'm looking at page 85 of the transcript. This is at the end of recross. He had undergone direct cross, redirect, and then recross. He was asked, quote, had Mr. Holmes told you to leave and said, quote, there's no trespassing signs here, you wouldn't have left, was the question posed to Detective Tompkins, and his answer was, quote, honestly, sir, I don't know. If he asked me to, I have a legal obligation. If I'm not able to validate his information, if he just opened the door and said, quote, no trespassing sign, you have to leave, I would ask him at least, may I have to identify who he is. So I take that answer to mean that the detective wasn't going to leave. So even had Mr. Holmes, in this particular instance, said, hey, get off my property, I think the detective just said, well, I still have to go forward and validate what I want to do, and I'm not going to listen to that instruction. But that doesn't answer the question as to how the doctrine of implied consent can be revoked under these circumstances, does it? In light of all the surrounding circumstances, I come back to the notion of reasonableness. Here you have a residential house in an urban setting, small boarded up porch, you have mesh screen, you have lattice that covers the front door, you've got the front door, we don't know whether or not that was locked, burglar doors, absence of doorbell, the chain link fence, the gate, the truck blocking the driveway, the signs, four of them, beware of dog, which can ordinarily denote, hey, come on my property, you're subject to attack by my guard dog, private property, all of the other factors that I think that the district court judge in this case gave little weight to suggest, or at least to me, unequivocally and expressly say, I don't want you coming on my property, and for that matter. Even though the Supreme Court has said that knock and talks are constitutional, and that the officers have a right to knock on the door. If they don't commit a trespass, knock and talks are permissible so long as the police can lawfully come onto the property. Trespassing itself means, you know, you're not there for an unlawful reason. Jardines doesn't go that far. Jardines doesn't say that the police can't enter the property to at least knock on the door. It says they can't enter and run a canine dog around, or heat sensors like in Kilo, or things of that nature. Had they just gone to the door and knocked under the Constitution, that's reasonable. Knock and talks are perfectly fine. It's an investigatory tool. It's a consensual encounter. It meets with Fourth Amendment jurisprudence, but the totality of the case, or the circumstances of this case, tell us that the police were barred from even coming onto the property. So they couldn't conduct a knock and talk under your view of law? Not in this case. When we look at all the surrounding circumstances, you have the mailbox outside of the gate. You have the trash cans out front. They could have very well done trash pulls. They had three prior attempts in terms of approaching the house in this particular case. When we look at the pictures in this matter, all of it suggests that, as the judge found in footnote 30, that many of the barriers used by Holmes might well deter Girl Scouts, trick-or-treaters, or anyone who has a casual interest in visiting. To me, that's the reasonable, respectful citizen. Even the district court said what Mr. Holmes did in this case expressly revoked any implied license to approach his front door. We'd ask for reversal on this particular case. Thank you, Your Honor. All right. Thank you, counsel. We'll recess now. That's fine. Yeah. Whenever you want. Be fine with me.         All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. 10